## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CHARLES LUTZ, derivatively on behalf of
ASSERTIO THERAPEUTICS, INC. f/k/a
DEPOMED, INC.,

             Plaintiff,

    v.

ARTHUR JOSEPH HIGGINS, JAMES A.
SCHOENECK, AUGUST J. MORETTI,
SRINIVAS G. RAO, MATTHEW M.
GOSLING, JAMES P. FOGARTY, PETER D.
STAPLE, KAREN A. DAWES, LOUIS J.
LAVIGNE, JR., JAMES L. TYREE,
WILLIAM T. McKEE, DAVID B. ZENOFF,
SAMUEL R. SAKS, VICENTE ANIDO, JR.,
ROBERT G. SAVAGE, and GAVIN T.
MOLINELLI

             Defendants,

    and

ASSERTIO THERAPEUTICS, INC. f/k/a
DEPOMED, INC.,

             Nominal Defendant.

Case No.: _____

**JURY TRIAL DEMANDED**

**REDACTED
PUBLIC VERSION**

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Charles Lutz ("Plaintiff") brings this action derivatively for the benefit of nominal

defendant Assertio Therapeutics, Inc., formerly known as Depomed, Inc. ("Depomed" or the

"Company"). Plaintiff bases his allegations on personal knowledge as to himself, and upon

information and belief as to all other matters. Plaintiff's information and belief is based upon,

among other things, his counsel's investigation, which included, *inter alia*, review and analysis of:

(i) regulatory filings made by Depomed with the U.S. Securities and Exchange Commission

("SEC"); (ii) press releases issued and disseminated by Depomed; (iii) certain of the Company's Board of Directors ("Board") and Audit Committee materials (the "Confidential Board Materials") garnered through a demand for books and records made pursuant to California Corporate Code § 1601(a) (the "Books and Records Demand"); (iv) a purported class action lawsuit filed in the United Stated District Court for the Northern District of California against Depomed and defendants Arthur Joseph Higgins ("Higgins"), James A. Schoeneck ("Schoeneck"), and August J. Moretti ("Moretti"), captioned *Huang v. Assertio Therapeutics, Inc., et al.*, Case No. 3:17-cv-04830, alleging violations of the federal securities laws based on the alleged issuance of false and misleading statements of material fact, and the alleged omission of material facts necessary to make other issued statements not misleading, between July 29, 2015 and August 7, 2017, with respect to the Company's opioid marketing practices and the heightened legal and regulatory scrutiny related thereto (the "Securities Class Action"); and (v) other publicly-available information, including media and analyst reports, concerning Depomed.

## INTRODUCTION

1.     This is a stockholder derivative action asserting claims for breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and SEC Rule 14a-9 promulgated thereunder brought on behalf of nominal defendant Depomed against certain of its current and former officers and directors.

2.     Depomed was founded in 1995 and is engaged in the marketing of products for treatment of neurology, pain, and diseases of the central nervous system.  The Company's most profitable product is a strong opioid pain reliever known as NUCYNTA (tapentadol).

3.     NUCYNTA comes in two forms: extended release for pain management throughout the entire day and immediate release (collectively, "NUCYNTA").  Depomed acquired U.S. rights to NUCYNTA from Janssen Pharmaceuticals, Inc. ("Janssen") for $1.05 billion in April 2015. NUCYNTA immediately became the Company's flagship product.  Since that time, the Individual Defendants (as defined herein) have dedicated substantial Company resources to aggressively promoting NUCYNTA.  The Individual Defendants added substantial manpower to Depomed's sales force and focused these new sales people on various levels of prescribing doctors and nurses and encouraging those prescribers to prescribe greater dosages of NUCYNTA.  These practices led to record financial success for the Company from 2015 to March 28, 2017.

4.     In addition to purchasing the right to sell NUCYNTA, Depomed also acquired the legal and regulatory risks associated with NUCYNTA.  Prior to the acquisition, Janssen had been named as a defendant in several lawsuits brought by municipalities for its marketing of NUCYNTA.  After the acquisition, Depomed became a party to these actions.

5.     Depomed also aggressively markets Lazanda, its branded fentanyl, another strong opioid.  Lazanda is a nasal spray for the management of breakthrough cancer pain, severe pain that erupts while a patient is already medicated with a long-acting painkiller, in patients 18 years and older.

6.     In the United States, highly addictive and powerful opioids, such as NUCYNTA and Lazanda, fall under Schedule II of the Controlled Substances Act ("CSA").  Schedule II controlled substances, while having an accepted medical use, are considered dangerous and have a high potential for abuse, which may lead to severe psychological or physical dependence in users. Other Schedule II controlled substances include cocaine, codeine, morphine, and opium.

7.      America is in the midst of an opioid epidemic.  According to statistics released by the Centers for Disease Control and Prevention ("CDC") on November 29, 2018, there were 70,237 drug overdose deaths in the United States in 2017.  28,466 of those deaths were due to fentanyl or a similar opioid.  Most startling is the fact that the overdose rate for these drugs increased by 45% between 2016 and 2017.

8.      The sale, marketing, and use of pharmaceutical drugs, such as NUCYNTA and Lazanda, are heavily regulated by the U.S. Drug Enforcement Administration ("DEA") and Food and Drug Administration ("FDA").

9.      The DEA is the federal law enforcement agency within the U.S. Department of Justice tasked with combating drug smuggling and distribution of drugs within the U.S.  The DEA primarily enforces the CSA and coordinates and pursues drug investigations on behalf of the U.S., both domestic and abroad.

10.      The FDA is responsible for protecting and promoting public health through the control and supervision of food safety, tobacco products, dietary supplements, prescription and over-the-counter pharmaceutical drugs (medications), vaccines, biopharmaceuticals, blood transfusions, medical devices, electromagnetic radiation emitting devices (ERED), cosmetics, animal foods & feed, and veterinary products.

11.      The FDA's labeling rules are designed to make information in prescription drug labeling easier for health care practitioners to access, read, and use when making prescribing decisions.  Many drugs intended to help cure diseases or other medical conditions can also have injurious or even deadly consequences when used inappropriately or by the wrong patient.  Thus, it is illegal to market or promote drugs for any other purpose than the uses approved by the FDA, any other use is known as an "off-label" use.  However, some executives and directors of

pharmaceutical companies market their products for off-label uses anyway in an effort to inflate short-term profitability and sales of their drugs.  Recently, government agencies have started to combat this dangerous epidemic by announcing widespread investigations and occasionally vigorously prosecuting and imposing criminal and civil penalties on members of the pharmaceutical industry that violate these laws.

12.    From April 2015 to the present (the "Relevant Period"), the Individual Defendants have caused Depomed to illegally promote sales of the highly dangerous NUCYNTA and Lazanda, for off-label uses to increase sales and profitability.  NUCYNTA's annual sales increased in the U.S. from $189.9 million in 2015, shortly after Depomed acquired it, to approximately $281.3 million in 2016, becoming the Company's top selling drug.  This marked a 48% year-over-year growth in sales of NUCYNTA, essentially legal heroin.  NUCYNTA's sales during this period were greater than the sales of the Company's other products – Gralise, CAMBIA, Zipsor, and Lazanda – combined, making up 62% of Depomed's total revenue.  Sales of Lazanda also dramatically increased during this period, from $6.9 million in 2014 to $26 million by 2016, a three-year increase of 277%.

13.    This rampant, illegal promotion of NUCYNTA and Lazanda eventually ran afoul of government regulators.  After several years of illegal, off-label marketing schemes, caused, directed, and/or permitted by the Individual Defendants, on March 28, 2017, U.S. Senator Claire McCaskill ("Senator McCaskill") and the Senate Committee on Homeland Security and Governmental Affairs announced that it had launched an investigation into the promotion of opioids by pharmaceutical manufacturers.  Senator McCaskill announced that the investigation would explore whether Depomed and its peers have contributed to opioid over-utilization and over-prescription, citing overdose deaths in the last fifteen years approaching nearly 200,000.

Senator McCaskill also published the letter she had sent to Depomed requesting a laundry list of documents related to her investigation (the "McCaskill Letter").

14.     Following this news, Depomed's stock price fell $2.35 per share, or 16%, representing a decrease of more than $145.9 million in market capitalization.

15.     Several months later, on August 7, 2017, the Individual Defendants finally caused Depomed to confirm that it had received a request for information from Senator McCaskill's committee, as well as subpoenas from U.S. Department of Justice and the Maryland Attorney General.  In the Company's quarterly report for the third quarter of 2017, filed on Form 10-Q with the SEC on August 7, 2017, the Individual Defendants caused the Company to admit that its adjusted earnings amounted to only $5 million, and that it had greatly reduced its forecast for the full year 2017.  The reduced prediction was $10 million to $15 million lower than previously reported and cut its adjusted pretax operating profit projection by approximately 10%.  The stated reason for these reductions was increased regulatory oversight over the opioid markets and associated legal expenses.

16.     Following this news, Depomed's stock price fell $3.08 per share, or 33%, representing a decrease of more than $194.3 million in market capitalization.  In total the Company's value had dropped over 80% since a high in 2015 shortly after the acquisition of NUCYNTA from Janssen, representing a total decrease of over $1.6 billion in market capitalization.

17.     Although the Individual Defendants repeatedly emphasized in SEC filings (i) the Company's limited history of selling and marketing pharmaceutical products; (ii) the substantial legal and regulatory framework for the pharmaceutical industry; and (iii) the adverse consequences of off-label drug promotion as a major risk factor facing the Company, incredibly, ████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████.

18.     Throughout the Relevant Period, the Individual Defendants breached their fiduciary duties of loyalty, good faith, due care, oversight, and candor by willfully causing the Company to engage in the illegal marketing scheme and deceptions alleged herein and by causing the Company to issue materially false and misleading statements.  Specifically, the Individual Defendants caused the Company to fail to disclose that it was engaged in an unlawful scheme to: (1) market its opioid drugs for off-label uses; (2) increase patient dependency on its opioid drugs; and (3) downplay the risk of addiction associated with its opioid drugs; and as a result of the foregoing, the Company's statements about Depomed's business, operations, and prospects were materially false and/or misleading and/or lack a reasonable basis.

19.     In addition, the Individual Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 by soliciting Depomed stockholder votes for, *inter alia*, director reelection and approval of stock issuances and executive compensation while simultaneously misrepresenting and/or failing to disclose the truth regarding its illegal opioid marketing scheme.

20.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, Depomed has sustained damages as described below.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the Complaint alleges a claim for violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9.  This Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C.

§ 1367(a) because the state law claims form part of the same case or controversy.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

22.     This Court has jurisdiction over each defendant because he or she either resides in this District or has sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. This Court has personal jurisdiction over nominal defendant Depomed because it is authorized to do business in this state, has consented to service in this state, and is incorporated in this District.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because (i) one or more of the defendants either resides or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; and (iii) defendants have received substantial compensation and other transfers of money in this District by doing business and engaging in activities having an effect in this District.

## PARTIES

24.     Plaintiff has been a stockholder of Depomed at all relevant times and has continuously held Depomed common stock at all relevant times.  Plaintiff made a demand to inspect the books and records of Depomed on November 17, 2017.

25.     Nominal defendant Depomed, now known as Assertio Therapeutics, Inc., is incorporated in Delaware, and its headquarters and principal executive offices are currently located at 100 S. Saunders Road, Suite 300, Lake Forest, Illinois 60045.  Its securities are currently traded on the NASDAQ Select Global Market under the ticker symbol "ASRT."

26.     Defendant Higgins has been Depomed's President, Chief Executive Officer ("CEO"), and a member of the Board since March 2017.  He is also named as a defendant in the

Securities Class Action.  Defendant Higgins received $4,766,537 in total compensation from the Company in 2017.

27.     Defendant Schoeneck was Depomed's President and CEO from April 2011 to March 2017 and a director from December 2007 to March 2017.  He is named a defendant in the Securities Class Action.  Defendant Schoeneck received $6,329,992, $6,167,070, and $4,514,170 in total compensation from the Company in 2015, 2016, and 2017, respectively.

28.     Defendant Moretti was Depomed's Chief Financial Officer from January 2012 to July 16, 2018.  He was also Senior Vice President and Principal Accounting Officer from January 2012 to July 16, 2018.  He is named as a defendant in the Securities Class Action.  Defendant Moretti received $1,490,539, $1,805,459, and $1,732,657 in total compensation from the Company in 2015, 2016, and 2017, respectively.

29.     Defendant Srinivas G. Rao ("Rao") was Depomed's Senior Vice President and Chief Medical Officer from July 16, 2014 until he resigned on July 31, 2017.  He received $1,688,507 and $1,711,395 in total compensation from the Company in 2016 and 2017, respectively.

30.     Defendant Matthew M. Gosling ("Gosling") has been Depomed's General Counsel and Senior Vice President since January 2011 and prior to that was General Counsel and Vice President dating back to 2006.  As General Counsel, he should have been aware and taken action to prevent the regulatory scrutiny that Depomed was subjected to as a result of its illegal marketing scheme.  ██████████████████████████████████████████████

████████████  ████████████████████████████████████

Defendant Gosling received $2,022,447 and $1,994,991 in total compensation from the Company in 2015 and 2016, respectively.

31.     Defendant James P. Fogarty ("Fogarty") has been the Chairman of Depomed's Board since March 2017 and a member of the Board since October 2016.  He received $196,242 and $205,887 in total compensation from the Company in 2016 and 2017, respectively.

32.     Defendant Peter D. Staple ("Staple") has been a member of the Board since November 2003.  He previously was Chairman of the Board from March 2009 to March 2017. Defendant Staple has been a member of the Board's Audit Committee since October 2016.  He received $209,979, $213,107, and $203,471 in total compensation from the Company in 2015, 2016, and 2017, respectively.

33.     Defendant Karen A. Dawes ("Dawes") has been a member of the Board since April 2008.  She has also been a member of the Board's Audit Committee since July 2014 and was Chair of the Compensation Committee from at least April 1, 2013 to March 28, 2017.  Defendant Dawes received $208,479, $202,482, and $192,971 in total compensation from the Company in 2015, 2016, and 2017, respectively.

34.     Defendant Louis J. Lavigne ("Lavigne") has been a member of the Board since July 2013.  He has also been a member of the Audit Committee since July 2013 and was Chair of the Board's Audit Committee from April 2014 to at least July 2017.  Defendant Lavigne received $194,979, $194,982, and $200,707 in total compensation from the Company in 2015, 2016, and 2017, respectively.

35.     Defendant James L. Tyree ("Tyree") has been a member of the Board since October 2016.  He was also a member of the Board's Audit Committee from at least October 2016 to July 2017.  Defendant Tyree received $196,867 and $190,366 in total compensation from the Company in 2016 and 2017, respectively.

36.     Defendant William T. McKee ("McKee") has been a member of the Board since March 28, 2017.  He is also Chair of the Board's Audit Committee.  Defendant McKee received $357,818 in total compensation from the Company in 2017.

37.     Defendant David B. Zenoff ("Zenoff") was a member of the Board from March 2007 to March 28, 2017.  He received $194,992, $194,982, and $17,917 in total compensation from the Company in 2015, 2016, and 2017, respectively.

38.     Defendant Samuel R. Saks ("Saks") was a member of the Board from October 2012 to March 28, 2017.  He received $189,979, $189,982, and $16,722 in total compensation from the Company in 2015, 2016, and 2017, respectively.

39.     Defendant Vicente Anido, Jr. ("Anido") was a member of the Board from February 2013 to May 2016.  He also was a member of the Board's Audit Committee from at least April 2014 to May 2016.  Defendant Anido received $187,479 in total compensation from the Company in 2015.

40.     Defendant Robert G. Savage ("Savage") was a member of the Board from October 2016 to August 15, 2017.  He received $194,992 and $43,292 in total compensation from the Company in 2016 and 2017, respectively.

41.     Defendant Gavin T. Molinelli ("Molinelli") was a member of the Board from March 28, 2017 to August 15, 2017.

42.     Defendants Higgins, Moretti, Schoeneck, Rao, Fogarty, Staple, Dawes, Lavigne, Tyree, McKee, Zenoff, Saks, Anido, Savage, and Molinelli are collectively referred to herein as the "Individual Defendants."

### DUTIES OF THE INDIVIDUAL DEFENDANTS

43.     Due to their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual

Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

44.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

45.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

- Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

- Conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

- Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the

Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

- Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

- Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

46.     Each of the Individual Defendants, as a director and/or officer, owed to the Company and its stockholders, the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

47.     The Company has also adopted a Code of Business Conduct and Ethics governing the conduct of all directors, officers, and employees (the "Code").  The Code sets forth the following requirements for lawful and ethical behavior:

**1.      Lawful and Ethical Behavior**

The foundation on which this Code of Conduct is built is obeying the law and acting ethically.  It is the Company's policy that you conduct business in accordance with applicable federal, state and local laws, rules and regulations and with the laws, rules and regulations of other countries in which the Company does

business which are not in conflict with your responsibilities under United States laws and regulations.  In addition, the Company's policy requires that you adhere to the highest standard of business ethics and conduct.

You must be alert and sensitive to situations that could result in illegal, unethical, or improper action.  When you are faced with a business decision that seems to have ethical overtones, here are some questions that should be helpful to determine if your actions are proper:

- Do I have all the necessary facts?

- Am I informed about all of the legal implications?

- Who has an important stake in the outcome (e.g., employees, customers, suppliers, etc.), and what is that stake?

- Does the issue raise ethical issues that go deeper than legal or institutional concerns?

- What are the options for acting, and which options will produce the most good and do the least harm?  Which options respect the dignity of all stakeholders?

If you remain uncertain about what to do, if you need advice, or if you have reason to believe that a United States or foreign law could be violated in connection with Company business or that this Code of Conduct has been violated in any way, notify your supervisor, the General Counsel, the Compliance Officer or the Chairman of the Audit Committee.

## 2.    Code of Ethics

This Code of Ethics is promulgated by the Board of Directors under Section 406 of the Sarbanes Oxley Act of 2002 and the rules of the SEC promulgated thereunder and applies to all employees, officers and directors of the Company.  It should be read in conjunction with the rest of this Code of Conduct and it contains standards reasonably necessary to promote:

- Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- Full, fair, accurate, timely, and understandable disclosure in the periodic reports required to be filed by the issuer and in other public communications; and

- Compliance with applicable governmental laws, rules and regulations.

You must:

a. Act with honesty and integrity and be able to identify and appropriately handle actual or apparent conflicts of interest. You should recognize that even the appearance of a conflict of interest can damage the Company. A conflict of interest may exist because of a relationship of yours or of a family member that could cause a conflict with your ability to perform your job responsibilities.

b. Produce, or cause to be produced, full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with or submits to the SEC and in other public communications.

c. Comply with applicable governmental laws, rules and regulations.

d. Promptly report any violation of this Code of Ethics to the Chairman of the Audit Committee or the General Counsel or the Compliance Officer, as applicable. Reports also may be made anonymously via the Company's confidential reporting hotline.

e. Promote ethical behavior by Company officers and employees involved in financial reporting.

You will be held accountable for your adherence to this Code of Ethics. Your failure to observe the terms of this Code of Ethics may result in disciplinary action, up to and including immediate termination of your employment.

If you are an executive officer or director, any request by you for a waiver of any provision of this Code of Ethics must be in writing and addressed to the Chairman of the Audit Committee. If you are not an executive officer or director, any request by you for a waiver of any provision of this Code of Ethics must be in writing and addressed to the General Counsel.

With regard to executive officers and directors, the Board will have the sole and absolute discretionary authority, acting upon such recommendation as may be made by the Audit Committee, to approve any waiver from this Code of Ethics. Any waiver for executive officers or directors from this Code of Ethics will be disclosed within four days on Form 8-K or any other means approved by the Securities and Exchange Commission.

48.    The Code specifically prohibits off-label drug promotion as follows:

**12.    Sales and Marketing Practices; No Off Label Promotion**

Each employee or other Company representative, in performing his or her duties, is responsible for truthfully conveying product attributes in accordance with government-approved labeling. You must not misstate facts or create misleading impressions in any labeling, advertising, packaging, literature or public statements.

You must not promote a product for a use other than that specified in the approved product label.  Omissions of important facts, safety information or wrongful emphasis of material may be misleading; the total impression of the message must be fairly balanced.

Many laws, regulations, guidelines, policies and procedures are applicable to the sale and marketing of our products, including regulations of the U.S. Food and Drug Administration (the "FDA"), the PhRMA Code on Interactions with Healthcare Professionals (the "PhRMA Code") and the Office of Inspector General (the "OIG") guidelines, among others.  The Company provides specific training in these matters to its sales and marketing personnel and others in the Company involved in these activities.  Violations of these laws, regulations, policies and procedures, including violations of the CCP, will lead to disciplinary actions, up to and including immediate termination of employment.

Vendors, consultants and third party service suppliers of services in connection with our sales and marketing activities must comply with all applicable laws, regulations, guidelines, policies and procedures.  Each employee who engages a third party to perform these activities is responsible to ensure compliance by the third parties.

If you have any questions regarding sales and marketing practices and whether such practices might constitute a violation of this Code of Conduct, please discuss the situation with the Compliance Officer.

\*        \*        \*

### 15.      Compliance with Laws, Regulations and Industry Codes

The Company is committed to conducting its business activities in accordance with applicable federal, state and local laws and regulations.  You are expected to have a level of familiarity with important laws and regulations applicable to your duties for the Company that is appropriate for your position.  You may contact the Legal Department with any questions regarding laws and regulations applicable to your duties.

_Food and Drug Laws_.  The FDA is the federal agency responsible for overseeing the safety of pharmaceuticals, biologics, medical devices, and other products.  The FDA regulates almost every aspect of the Company's business, including the research, development, manufacturing, distribution, marketing, and promotion of our products.

_Labeling, Advertising, and Promotion_.  FDA regulations require drug labeling and promotional material to be adequate, balanced, and truthful. Among other things, FDA regulations require all materials and messaging used to promote our products to be fair and balanced and consistent with FDA-approved labeling. To ensure compliance with FDA regulations, you must comply with all Company policies and procedures related to promotional activities.

16

\*     \*     \*

*Product Safety and Reporting Adverse Events*.  As required by applicable laws and regulations, the Company closely monitors all reports of adverse events associated with the use of Company products to ensure that we consistently adhere to the highest levels of safety and accountability.  You are required to identify, record, and promptly report any safety, quality, or performance issues, or any circumstance that suggests the occurrence of any of these issues, in accordance with applicable law and Company policy.

\*     \*     \*

*The PhRMA Code*.  The purpose of the PhRMA Code is to ensure that healthcare decisions are made for the benefit of patients and are not based on undue influence from pharmaceutical companies.  It provides examples of proper and improper practices regarding pharmaceutical companies' interactions with HCPs.  Compliance with the PhRMA Code substantially reduces the risk of violating the federal Anti- Kickback Statute.  The majority of the pharmaceutical industry, including the Company, has adopted and embraced the PhRMA Code, and your activities must comply with it.

49.    In addition, the Company's Audit Committee, comprised of defendants McKee (chair), Anido,[1] Dawes, Lavigne (former chair), Staple, and Tyree,[2] was specifically tasked with the Board's oversight responsibilities.  The Audit Committee's Charter states in pertinent part:

The purpose of the Audit Committee (the "Committee") of the board of directors (the "Board") of Depomed, Inc. (the "Company") is to assist the Board in fulfilling its audit oversight responsibilities.  In its audit oversight role, the Committee shall have the principal duties and responsibilities set forth below.

- Review the integrity of the Company's financial statements, financial reporting and accounting processes, and systems of internal controls regarding finance and accounting.

- Review the independence, qualifications and performance of the Company's independent auditor and the personnel performing the internal audit function.

- Facilitate communication among the independent auditor, management, the personnel responsible for the internal audit function and the Board.

---

[1]  Anido was a member of the Audit Committee until May 2016.

[2]  Tyree was a member of the Audit Committee until July 2017.

- Assist the Board in the oversight of the Company's compliance with applicable legal, regulatory and tax provisions related to the above denoted areas.

- Prepare the report that is required to be included in the Company's annual proxy statement pursuant to the rules and regulations of the Securities and Exchange Commission (the "Commission").

50.     In addition, the Audit Committee has the following specific responsibilities:

- Discuss with management the Company's major financial, accounting, legal and business risk exposure and the steps management has taken to monitor and control such exposure, including the Company's policies, practices and plans with respect to enterprise risk assessment, enterprise risk management, crisis communications, disaster recovery and the risk of fraud.

- Discuss with management, including the Company's General Counsel, the Company's compliance with applicable laws and regulations or other legal matters that may have a material effect on the Company's financial statements and results of operations.

51.     

## **SUBSTANTIVE ALLEGATIONS**

**Company Background**

52.     Depomed is a specialty pharmaceutical company that engages in the development, sale, and licensing of products for pain and other central nervous system conditions. The Company sells its products to wholesalers and retail pharmacies.

53.     The Company was formerly known as Depomed, Inc. and was headquartered and incorporated in California. On August 14, 2018, Depomed merged into its Delaware subsidiary, Assertio Therapeutics, Inc., and took the subsidiary's name.  The Company is now re-incorporated in Delaware and headquartered in Lake Forest, Illinois.  As part of the merger, all Depomed shares effectively became Assertio Therapeutics, Inc. shares pursuant to Rule 12g-3(a) of the Exchange Act.  The Company has stated that "[o]ther than the change in the Company's name and state of incorporation, the Reincorporation and Name Change itself did not result in any change in the business, management, assets, liabilities or capitalization of the Company."

**NUCYNTA and Lazanda – Depomed's Top-Selling Opioids**

54.     On January 15, 2015, Depomed entered into an Asset Purchase Agreement with Janssen, wherein the Company would pay $1.05 billion to acquire the rights to sell NUCYNTA opioid drug products in the U.S.  The acquisition covered both NUCYNTA ER (extended release tablets pain management tablets), NUCYNTA IR (immediate release version of the same), and NUCYNTA oral solution (which has not yet been commercialized).  The Janssen deal closed on April 2, 2015, and the Individual Defendants quickly proclaimed that NUCYNTA was now the "flagship asset" in Depomed's portfolio of pain and neurology specialty pharmaceuticals in a press release issued that same day.

55.     The FDA has approved NUCYNTA for the management of moderate to severe acute pain in patients eighteen years of age and older.  The FDA has also approved Lazanda, Depomed's fentanyl nasal spray, for the management of breakthrough cancer pain in cancer patients eighteen years of age and older.

56.     NUCYNTA joined Lazanda in Depomed's portfolio of opioid agonist drug products.  Both Lazanda (fentanyl) and NUCYNTA (tapentadol) are Schedule II controlled

substances under the CSA.  Schedule II drugs are those with the following findings: (1) a high potential for abuse; (2) currently accepted medical use in treatment in the U.S., or currently accepted medical use with severe restrictions; and (3) abuse may lead to severe psychological or physical dependence.

57.     Despite opioids being the legal pharmaceutical equivalent of heroin or opium, they were pushed by a number of large pharmaceutical companies starting in the 1990s and their exploitation has led to the strong and dangerous drugs being pushed onto patients who do not need them or do not need them for the period of time and in the strength they are prescribed.

58.     This has led to out-of-control dependency on the highly dangerous drugs on a national scale.  This national epidemic threatens the health and safety of millions of Americans. Many call the opioid epidemic "the worst drug crisis in American history" and *Frontline* reports that the opioid death rate now rivals that of AIDS during the 1990s, with opioids killing more than 27,000 people each year.  By 2014, opioids had overtaken all other drugs as the leading killer of Americans.  When combined with deaths due to heroin, the street opioid, the numbers are even more staggering.  In 2014, cocaine only killed 5,415 Americans, while opioids alone killed 18,893 (and the combined number with heroin deaths was 29,467).  The main contributor to these numbers is the increase in opioid prescriptions; they nearly tripled between 1991 and 2011 from 76 million to 219 million and have only increased to the present day.

59.     Due to off-label and aggressive marketing tactics of dangerous opioids, millions of patients get hooked on the products.  Once their prescriptions or abilities to pay for prescription medications expire, these patients are forced to purchase heroin or synthetic opioids from street dealers.  According to a report released by the CDC on November 29, 2018, the most recent trend is for street dealers to distribute synthetic fentanyl that is often stronger than heroin.  Between

2016 and 2017, the use of these super-strength synthetic opioids has caused a 45% increase in fentanyl-related overdose deaths, from 6.2 to 9.0 per 100,000.

**The Illegal Off-Label Opioid Marketing Scheme**

60.     Dangerous opioid products, like NUCYNTA and Lazanda, are subject to numerous federal laws and regulations governed by the FDA.  The FDA is tasked with protecting and promoting public health through the regulation and supervision of, among other things, prescription drugs, via the authority given to it in the Federal Food, Drug, and Cosmetic Act ("FDCA").

61.     Pursuant to the FDCA and the Public Health Services Act ("PHSA"), drug manufacturers may not market or promote a drug for "off-label" use, or for a use the FDA has not approved.  A drug may not be marketed or sold in the U.S. unless the FDA has approved the drug as safe and effective for its intended use and intended indication.  The intended indications for use of the drug are provided in the drug's label, which the FDA reviews and approves.  Violation of the FDCA and PHSA are punishable by criminal and civil penalties including substantial fines.

62.     In addition to prohibiting manufacturers from directly marketing and promoting a drug's off-label uses, Congress and the FDA have enacted laws and regulations intended to prevent manufacturers from using indirect means to accomplish this same improper end.  Two of the most utilized indirect promotional strategies are: (i) manufacturer dissemination of medical and scientific publications concerning the off-label use of its products; and (ii) manufacturer support for Continuing Medical Education ("CME") programs that focus on off-label uses.  To combat these violations, the FDA places stringent requirements on drug marketing materials and requires that CME programs be truly independent of drug companies such that they are "free from the supporting company's influence and bias."

63.    The FDA often brings claims under the False Claims Act ("FCA"), which protects against attempts to defraud the federal government by prohibiting a person from making, or conspiring to make, a false record, claim, or statement concerning the federal government.  The submission of claims to government programs is a reasonably foreseeable consequence to manufacturers who promote off-label use.  Providers' claims for payment from government programs, such as Medicare and Medicaid, for drugs used off-label as a result of illegal promotions or marketing are false or fraudulent.  Accordingly, FCA enforcement is appropriate because manufacturers who promote products off-label "cause" claims for reimbursement for off-label uses to be submitted to the federal government through programs such as Medicare and Medicaid.

64.    When Depomed acquired the right to sell NUCYNTA in the U.S. from Janssen in April 2015, the product was already commonly marketed for off-label purposes and Janssen was already under fire for doing so.  Rather than observing these red flags and ensuring that Depomed take extra care to follow all laws and regulations especially with regard to its marketing and sale of NUCYNTA, the Individual Defendants hired many of the same sales representatives – from a company called Quintiles – who had illegally marketed and sold NUCYNTA for Janssen (the "Quintiles Salespeople").

65.    On Depomed's July 29, 2015 earnings call, defendant Schoeneck stated, "Continuity was a key to our second quarter success as well as we hired Quintiles, the same contract sales organization that had marketed NUCYNTA previously to continue selling on our behalf while we completed the recruitment for positions in our expanded sales force leading up to our re-launch of NUCYNTA in June." Additionally, at another earnings call, on November 9, 2015, in response to a question about the ability of Depomed's salesforce, Schoeneck responded, "We certainly think we vetted well when we brought people in.  There was a group that actually

had been selling NUCYNTA before with quintiles that we brought onboard.  So on that group we actually had direct experience in seeing what they were able to accomplish under the contract with [Janssen]."

66.     After hiring the Quintile Salespeople to *ensure continuity* of the on-going illegal marketing scheme, the Individual Defendants then had them train Depomed's sales representatives on how to market NUCYNTA using the tactics that had landed Janssen in hot water.

67.     The Individual Defendants either knew or were reckless in not knowing that the Quintile Salespeople had a history of illegally marketing dangerous opioid drugs and would continue to do so if not corrected.  Publicly available examples of Janssen's marketing tactics – available to the Individual Defendants due to their inclusion in the Second Amended Complaint filed by the City of Chicago in *City of Chicago v. Purdue Pharma, et al.*, Case No. 14-cv-4361 (N.D. Ill.), naming both Janssen and Depomed as defendants (the "City of Chicago Complaint") – include:

> o     "One former Janssen sales representative, Sales Representative E, who was interviewed by the City and worked in Janssen's Midwest Region (the Regional Manager had offices in Naperville, Illinois) recalls selling Nucynta and Nucynta ER.  Her compensation was directly tied to how many Nucynta and Nucynta ER prescriptions were written by the doctors who were listed on the quarterly call plan she received from her district manager and how many doctors or clinics in her assigned zip codes prescribed the drugs that she was asked to sell.  This former sales representative stated that family practices and internal medicine doctors made up about 80% of the call plan targets for opioids; as noted above, these generalists are less knowledgeable about opioids and more likely to fall victim to sales representatives' misrepresentations. . . .    Sales Representative E was instructed to push the envelope when selling Nucynta ER and stress that Nucynta ER didn't hit receptors like other opioids so it was less addictive and had fewer withdrawal issues.  She also promoted Nucynta and Nucynta ER as a safer alternative to NSAIDs and, when discussing side effects related to Nucynta and Nucynta ER, she focused on nausea, itchy skin, and vomiting.  She told physicians that they could prescribe higher doses of Nucynta ER because its mechanism works differently than other opioids. She also recalls telling prescribers that Janssen's opioids can improve their

patients' ability to function in their lives, enabling them to get off workers' compensation or work pain-free.  She also recalls being provided various books, articles, and pamphlets to provide as handouts to physicians. . . . This former sales representative also recalls that Janssen's Midwest region would hold regional "Plan of Action" meetings three times a year, usually at a hotel or conference facility in a northern suburb of Chicago.  These meetings would include various presentations regarding the marketing of Janssen's drugs, including Nucynta and Nucynta ER.  The Midwest region also held weekly Friday calls, which were used to make sure that everyone followed the same strategy and talking points. Based on the uniform character of Janssen's marketing, Chicago sales representatives, who were in the same sales region, would have received the same sales training and made the same misrepresentations when detailing Chicago prescribers."

o   "Another former Janssen sales representative, Sales Representative F, who also worked in Janssen's Midwest region, recalls Janssen using a number of [key opinion leaders] in support of its efforts to sell Nucynta and Nucynta ER.  Some of these [key opinion leaders] were based in Chicago and participated in Janssen's speakers bureau.  On information and belief, based on the uniform and nationwide character of Janssen's marketing, these speakers were trained to deliver the misleading messages . . . to prescribers in Chicago."

o   "A third former Janssen sales representative, Representative G, whose territory included the suburbs northwest of Chicago, recalled selling Nucynta and Nucynta ER.  She promoted Nucynta and Nucynta ER as safe and effective for the long-term treatment of chronic pain and told physicians that drugs like Tylenol kill the liver and that Nucynta and Nucynta ER were cleaner by comparison and did not attack the organs."

o   Finally, a fourth former Janssen sales representative, Sales Representative H, who also worked in Janssen's Midwest Region, recalls selling Nucynta and Nucynta ER.  She recalls being trained to say that Nucynta and Nucynta ER did not offer the same euphoric feeling as other opioids.  She also recalled referring prescribers to a Youtube video that asserted that Nucynta was more difficult to crush than other pills, making it less likely to be abused or diverted.  Representative H believed that it was common for Janssen sales representatives to downplay the addictive nature of Nucynta and Nucynta ER.

68.    The City of Chicago Complaint called these messages and materials provided by Janssen to its sales force "part of a broader strategy to convince prescribers to use opioids to treat their patients' pain, irrespective of the risks, benefits, and alternatives" and stated that the "deception was national in scope."  Despite these public warnings, the Individual Defendants

caused Depomed to carry out the same scheme using the same salespeople ████████████
████████████████████████████████████████████████████

69.     Throughout the Relevant Period, the Individual Defendants caused or allowed the Company to market NUCYNTA and Lazanda for off-label uses.  They knew, or should have known, that this would subject Depomed to significant liability for FDCA, PHSA, and FCA violations.  The Individual Defendants breached their fiduciary duties by failing to monitor the Company's compliance with the laws prohibiting off-label marketing.

70.     The Individual Defendants knowingly caused or allowed Depomed to carry out a scheme to illegally market its highly dangerous opioid medications for off-label and medically unnecessary uses.  This has contributed to the nationwide opioid epidemic and led to the deaths and ruined lives of countless Americans.  In response to this widespread abuse, all branches of federal and state governments have increased regulatory scrutiny and prosecution of Depomed and its peers.

**The Individual Defendants' False and Misleading Statements**

**A.     2014 10-K**

71.     On February 26, 2015, the Individual Defendants caused the Company to file its annual report for 2014 on Form 10-K with the SEC (the "2014 10-K").  The 2014 10-K was signed by defendants Schoeneck, Moretti, Staple, Anido, Dawes, Lavigne, Saks, and Zenoff and was certified pursuant to Rules 13a-14(a) and 15d-14(a) of the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") by defendants Schoeneck and Moretti.  Notably, the 2014 K disclosed the following regarding "Marketing and Sales" of its products, including the about-to-be-acquired NUCYNTA:

## MARKETING AND SALES

We have developed capabilities in various aspects of our commercial organization through our commercialization of Gralise®, CAMBIA®, Zipsor® and Lazanda®, including sales, marketing, manufacturing, quality assurance, wholesale distribution, medical affairs, managed market contracting, government price reporting, compliance, maintenance of the product NDA and review, and submission of promotional materials. Members of our commercial organization are also engaged in the commercial and marketing assessments of other potential product candidates.

Our sales organization includes 188 full-time sales representatives. If we consummate the NUCYNTA® Acquisition, we expect to significantly increase the number of sales representatives. Our sales force primarily calls on pain specialists, neurologists and primary care physicians throughout most of the United States. Our marketing organization is comprised of professionals who have developed a variety of marketing techniques and programs to promote our products, including promotional materials, speaker programs, industry publications, advertising and other media.

72.     The 2014 10-K also specifically referenced the significant liability the Company

would face for engaging in any promotion of opioid drugs for off-label uses, as follows:

***We may incur significant liability if it is determined that we are promoting or have in the past promoted the "off-label" use of drugs.***

Companies may not promote drugs for "off-label" use—that is, uses that are not described in the product's labeling and that differ from those approved by the FDA. Physicians may prescribe drug products for off-label uses, and such off-label uses are common across some medical specialties. Although the FDA and other regulatory agencies do not regulate a physician's choice of treatments, the FDCA and FDA regulations restrict communications on the subject of off-label uses of drug products by pharmaceutical companies. The Office of Inspector General of the Department of Health and Human Services (OIG), the FDA, and the Department of Justice (DOJ) all actively enforce laws and regulations prohibiting promotion of off-label use and the promotion of products for which marketing clearance has not been obtained. If the OIG or the FDA takes the position that we are or may be out of compliance with the requirements and restrictions described above, and we are investigated for or found to have improperly promoted off-label use, we may be subject to significant liability, including civil and administrative remedies as well as criminal sanctions. In addition, management's attention could be diverted from our business operations and our reputation could be damaged.

***Pharmaceutical marketing is subject to substantial regulation in the United States and any failure by us or our collaborative partners to comply with applicable statutes or regulations could adversely affect our business.***

All marketing activities associated with Gralise®, Zipsor®, Lazanda® and CAMBIA®, as well as marketing activities related to any other products which we may acquire, such as NUCYNTA®, or for which we obtain regulatory approval, will be subject to numerous federal and state laws governing the marketing and promotion of pharmaceutical products.   The FDA regulates post-approval promotional labeling and advertising to ensure that they conform to statutory and regulatory requirements. In addition to FDA restrictions, the marketing of prescription drugs is subject to laws and regulations prohibiting fraud and abuse under government healthcare programs.   For example, the federal healthcare program anti-kickback statute prohibits giving things of value to induce the prescribing or purchase of products that are reimbursed by federal healthcare programs, such as Medicare and Medicaid.   In addition, federal false claims laws prohibit any person from knowingly presenting, or causing to be presented, a false claim for payment to the federal government.   Under this law, in recent years, the federal government has brought claims against drug manufacturers alleging that certain marketing activities caused false claims for prescription drugs to be submitted to federal programs.  Many states have similar statutes or regulations that apply to items and services reimbursed under Medicaid and other state programs, and, in some states, such statutes or regulations apply regardless of the payer.  If we, or our collaborative partners, fail to comply with applicable FDA regulations or other laws or regulations relating to the marketing of our products, we could be subject to criminal prosecution, civil penalties, seizure of products, injunctions, and exclusion of our products from reimbursement under government programs, as well as other regulatory actions against our product candidates, our collaborative partners or us.

73.    Despite these warnings in the 2014 10-K, which was signed and approved by defendants Schoeneck, Moretti, Staple, Anido, Dawes, Lavigne, Saks, and Zenoff, the Individual Defendants caused or allowed the Company to engage in the illegal off-label marketing scheme of its dangerous opioid drugs.

**B.    2015 Quarterly Reports**

74.    On May 11, 2015, the Individual Defendants caused the Company to file its first quarter 2015 quarterly report on Form 10-Q with the SEC.  It was signed and certified pursuant to SOX by defendants Schoeneck and Moretti and contained the exact same warning about off-label marketing as the 2014 10-K and an almost identical warning about government regulation.  The new regulation Risk Factor stated:

*Pharmaceutical marketing is subject to substantial regulation in the U.S. and any failure by us or our collaborative partners to comply with applicable statutes or regulations could adversely affect our business.*

All marketing activities associated with NUCYNTA® ER, NUCYNTA®, Gralise®, CAMBIA®, Zipsor® and Lazanda®, as well as marketing activities related to any other products which we may acquire, or for which we obtain regulatory approval, will be subject to numerous federal and state laws governing the marketing and promotion of pharmaceutical products. The FDA regulates post-approval promotional labeling and advertising to ensure that they conform to statutory and regulatory requirements. In addition to FDA restrictions, the marketing of prescription drugs is subject to laws and regulations prohibiting fraud and abuse under government healthcare programs. For example, the federal healthcare program anti-kickback statute prohibits giving things of value to induce the prescribing or purchase of products that are reimbursed by federal healthcare programs, such as Medicare and Medicaid. In addition, federal false claims laws prohibit any person from knowingly presenting, or causing to be presented, a false claim for payment to the federal government. Under this law, in recent years, the federal government has brought claims against drug manufacturers alleging that certain marketing activities caused false claims for prescription drugs to be submitted to federal programs. Many states have similar statutes or regulations that apply to items and services reimbursed under Medicaid and other state programs, and, in some states, such statutes or regulations apply regardless of the payer. If we, or our collaborative partners, fail to comply with applicable FDA regulations or other laws or regulations relating to the marketing of our products, we could be subject to criminal prosecution, civil penalties, seizure of products, injunctions, and exclusion of our products from reimbursement under government programs, as well as other regulatory actions against our product candidates, our collaborative partners or us.

75.     For the next two quarters, the Individual Defendants caused the Company to file quarterly reports on Form 10-Q with the SEC on August 3 and November 9, 2015, respectively. Each of these quarterly reports was signed and certified pursuant to SOX by defendants Schoeneck and Moretti and included identical off-label and government regulation Risk Factors, while failing to disclose the Company's illegal off-label marketing scheme.

**C.     2015 10-K**

76.     On February 26, 2016, the Individual Defendants caused the Company to file its annual report for 2015 on Form 10-K with the SEC (the "2015 10-K"). The 2015 10-K was signed by defendants Schoeneck, Moretti, Staple, Anido, Dawes, Lavigne, Saks, and Zenoff and was

certified pursuant SOX by defendants Schoeneck and Moretti.  The 2015 10-K's "Marketing and Sales" disclosure, continued to omit the illegal off-label marketing scheme, and was updated to include the increased sales staff due to the NUCYNTA acquisition, as follows:

### MARKETING AND SALES

We have developed capabilities in various aspects relating to the commercialization of our marketed products, including sales, marketing, manufacturing, quality assurance, wholesale distribution, managed market contracting, government price reporting, medical affairs, compliance, and regulatory.  Members of our commercial organization are also engaged in the commercial and marketing assessments of other potential product candidates.

Our sales organization includes approximately 300 full-time sales representatives. Our sales force primarily calls on pain specialists, neurologists and primary care physicians throughout most of the United States.  Our marketing organization is comprised of professionals who have developed a variety of marketing techniques and programs to promote our products, including promotional materials, speaker programs, industry publications, advertising and other media.

77.    The 2015 10-K continued to put forth the exact same off-label marketing and government regulation Risk Factors from the previous three quarters' Forms 10-Q.

### D.    2016 Quarterly Reports and 2016 10-K

78.    In 2016, the Individual Defendants caused the Company to file quarterly reports on Form 10-Q with the SEC on June 5, August 3, and November 7, respectively.  Each of these quarterly reports was signed and certified pursuant to SOX by defendants Schoeneck and Moretti and included identical off-label and government regulation Risk Factors, while failing to disclose the Company's illegal off-label marketing scheme.

79.    Then on February 24, 2017, the Individual Defendants caused the Company to file its annual report for 2016 on Form 10-K with the SEC (the "2016 10-K").  The 2016 10-K was signed by defendants Schoeneck, Moretti, Staple, Dawes, Fogarty, Lavigne, Saks, Savage, Tyree, and Zenoff and was certified pursuant SOX by defendants Schoeneck and Moretti.  The 2016 10-

K contained the exact same "Marketing and Sales" disclosure as the 2015 10-K and continued to omit any mention of the Company's illegal off-label opioid marketing scheme.  The 2016 10-K also continued to include the same off-label and government regulation risk factors as its preceding quarters.

### E.     2017 First Quarter Report

80.     On May 10, 2017, over a month after Senator McCaskill's investigation had been made public, the Individual Defendants caused the Company to file a quarterly report with the SEC for the first quarter of 2017.  It was signed and certified pursuant to SOX by defendants Higgins and Moretti and continued to include the identical off-label and government regulation Risk Factors, while failing to disclose the Company's illegal off-label marketing scheme.  Another Risk Factor, titled "Changes in laws and regulations applicable to the pharmaceutical industry, including the opioid market, may adversely affect our business, financial condition and results of operations," did see a material change, but still failed to mention Senator McCaskill's investigation, as follows:

> ***Changes in laws and regulations applicable to the pharmaceutical industry, including the opioid market, may adversely affect our business, financial condition and results of operations.***
>
> The manufacture, marketing, sale, promotion and distribution of our products are subject to comprehensive government regulation.  Changes in laws and regulations applicable to the pharmaceutical industry could potentially affect our business.  For instance, federal, state and local governments have recently given increased attention to the public health issue of opioid abuse.  The Centers for Disease Control (CDC) recently issued national, non-binding guidelines on the prescribing of opioids, providing recommended considerations for primary care providers when prescribing opioids, including specific considerations and cautionary information about opioid dosage increases and morphine milligram equivalents (MME). Certain payers are, or are considering, adopting these CDC guidelines. In addition, states, including the Commonwealth of Massachusetts and the State of New York, have either recently enacted or have pending legislation designed to among other things, limit the duration and quantity of initial prescriptions of immediate release form of opiates and mandate the use by prescribers of prescription drug databases. These and other initiatives may result in the reduced prescribing and use of opioids,

including NUCYNTA and NUCYNTA ER, which could adversely affect our business, financial condition and results of operations.  Additionally, we were named as a defendant in a case brought by the City of Chicago against a number of pharmaceutical companies marketing and selling opioid based pain medications, alleging misleading or otherwise improper promotion of opioid drugs to physicians and consumers.  This case against the Company was dismissed.  At the federal level, the White House Office of National Drug Control Policy continues to coordinate efforts between the FDA, the U.S. Drug Enforcement Agency (DEA) and other agencies to address this issue.  The DEA continues to increase its efforts to hold manufacturers, distributors, prescribers and pharmacies accountable through various enforcement actions as well as the implementation of compliance practices for controlled substances.  In addition, many state legislatures are considering various bills intended to reduce opioid abuse, for example by establishing prescription drug monitoring programs and mandating prescriber education.  Further, the FDA is requiring "black-box" warnings on immediate release opioids highlighting the risk of misuse, abuse, addiction, overdose and death.  In addition, during the 2016 presidential campaign, President Trump called for the DEA to restrict the amount of opioids that can be manufactured in the U.S.  In March 2017, President Trump announced the creation of a commission to make recommendations to the president regarding news laws and policies to combat opioid addiction and abuse.  These and other changes, and potential changes in laws and regulations, including those that have the effect of reducing the overall market for opioids or reducing the prescribing of opioids, could adversely affect our business, financial condition and results of operations.

81.     The above statements were materially false and/or misleading because they failed to disclose that Depomed was engaged in an unlawful scheme to: (1) market its opioid drugs for off-label uses; (2) increase patient dependency on its opioid drugs; and (3) downplay the risk of addiction associated with its opioid drugs; and as a result of the foregoing, the Company's statements about Depomed's business, operations, and prospects were materially false and/or misleading and/or lack a reasonable basis.

**The Individual Defendants Cause Depomed to Issue False and Misleading Proxy Statements**

82.     In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, the Individual Defendants also caused the Company to issue false and misleading proxy statements, which sought stockholder votes for, *inter alia*, director reelection and approval of executive compensation policies and share issuances.

83.     On April 16, 2016, defendants Schoeneck, Staple, Anido, Dawes, Lavigne, Saks, Gosling, and Zenoff caused the Company to file with the SEC and disseminate to stockholders a Proxy Statement on Form DEF 14A (the "2016 Proxy") in connection with the Company's annual stockholder meeting.  These Individual Defendants drafted, approved, reviewed, and/or signed the 2016 Proxy before it was filed with the SEC and disseminated to Depomed's stockholders. Defendants Schoeneck, Staple, Anido, Dawes, Lavigne, Saks, Gosling, and Zenoff knew, or were deliberately reckless in not knowing, that the 2016 Proxy was materially false and misleading.

84.     Among other things, the 2016 Proxy sought stockholder approval for the reelection of defendants Staple, Dawes, Lavigne, Saks, Schoeneck, and Zenoff to serve one-year terms as directors of the Company; an increase in the number of shares available for issuance under the Amended and Restated 2014 Omnibus Incentive Plan and 2004 Employee Stock Purchase Plan; and an advisory approval of executive compensation.

85.     The 2016 Proxy described director responsibilities; the duties of each Board committee; Board risk assessment and management; and explicitly referenced the Code, which includes special ethical obligations regarding financial reporting such that all SEC filings are to be accurate and specifically prohibits off-label promotion of the Company's drugs.

86.     The 2016 Proxy was false and misleading because the Individual Defendants were aware, but had failed to disclose that Depomed was engaged in an unlawful scheme to: (1) market its opioid drugs for off-label uses; (2) increase patient dependency on its opioid drugs; and (3) downplay the risk of addiction associated with its opioid drugs; and as a result of the foregoing, the Company's statements about Depomed's business, operations, and prospects were materially false and/or misleading and/or lack a reasonable basis.

87.     On July 14, 2017, defendants Fogarty, Dawes, Higgins, Lavigne, McKee, Molinelli, Savage, Staple, Tyree, and Gosling caused the Company to file with the SEC and disseminate to stockholders a Proxy Statement on Form DEF 14A (the "2017 Proxy") in connection with the Company's annual stockholder meeting.  These Individual Defendants drafted, approved, reviewed, and/or signed the 2017 Proxy before it was filed with the SEC and disseminated to Depomed's stockholders.  Defendants Fogarty, Dawes, Higgins, Lavigne, McKee, Molinelli, Savage, Staple, Tyree, and Gosling knew, or were deliberately reckless in not knowing, that the 2017 Proxy was materially false and misleading.

88.     Among other things, the 2017 Proxy sought stockholder approval for the election of defendants Fogarty, Dawes, Higgins, Lavigne, McKee, Staple, and Tyree to serve one-year terms as directors of the Company; an advisory approval of executive compensation.

89.     The 2017 Proxy described director responsibilities; the duties of each Board committee; Board risk assessment and management; and explicitly referenced the Code, which includes special ethical obligations regarding financial reporting such that all SEC filings are to be accurate and specifically prohibits off-label promotion of the Company's drugs.

90.     The 2017 Proxy was false and misleading because the Individual Defendants were aware, but had failed to disclose that Depomed was engaged in an unlawful scheme to: (1) market its opioid drugs for off-label uses; (2) increase patient dependency on its opioid drugs; and (3) downplay the risk of addiction associated with its opioid drugs; and as a result of the foregoing, the Company's statements about Depomed's business, operations, and prospects were materially false and/or misleading and/or lack a reasonable basis.

**The Truth Is Revealed**

91.     On March 28, 2017, the U.S. Senate Committee on Homeland Security and Governmental Affairs issued a press release titled, "Opioid Manufacturers are Subject of New

McCaskill-Led, Wide Ranging Investigation."   The press release announced that Senator McCaskill was seeking information from Depomed and other opioid companies.  The goal of the investigation was to explore whether pharmaceutical manufacturers have contributed to opioid overutilization and overprescription.  Senator McCaskill wanted to counteract the trend where opioid overdose deaths had approached 200,000 in the past fifteen years and 30,000 in 2015 alone. She also was interested in how the sales of opioid prescription drugs had quadrupled since 1999. Senator McCaskill's mission statement is best summed up by her statement in the press release:

> I hear it everywhere I go—drug overdose deaths, the vast majority of them related to prescription opioids or heroin, are single-handedly destroying families and communities across Missouri and the country, and I refuse to just stand by and watch—we have an obligation to everyone devastated by this epidemic to find answers.  All of this didn't happen overnight—it happened one prescription and marketing program at a time.  The vast majority of the employees, executives, sales representatives, scientists, and doctors involved with this industry are good people and responsible actors, but some are not.  This investigation is about finding out whether the same practices that led to this epidemic still continue today, and if decisions are being made that harm the public health.

92.    Senator McCaskill also published a letter she had sent to defendant Schoeneck, as Depomed's President and CEO, the same day.  The McCaskill Letter cited Depomed as a manufacturer of one of the top five opioid products by sales in 2015, and asked for the following documents from the Company:

1)    Documents showing any internal Depomed estimates of the risk of misuse, abuse, addiction, overdose, diversion or death arising from the use of any opioid product Depomed has manufactured, or any estimates of these risks produced by third-party contractors or vendors.

2)    Any reports Depomed has generated since January 2012 summarizing or concerning compliance audits of its sales and marketing policies.

3)    Marketing and business plans, including plans for direct-to-consumer and physician marketing, Depomed has developed since January 2012 for each opioid product Depomed has offered.

4)   Any slide decks, presentations, talking points, or other materials Depomed has provided to participants or speakers in Depomed speakers programs since January 2012.

5)   Quotas for Depomed sales representatives dedicated to opioid products concerning the recruitment of physicians for speakers programs since January 2012, broken down by year and quarter.

6)   Documents sufficient to show Depomed expenses relating to the entertainment of physicians by sales representatives dedicated to opioid products since January 2012, broken down by year and quarter.

7)   Documents sufficient to show Depomed funding of CME modules or other educational presentations for physicians, nurses, pharmacists, or other medical professionals since January 2012, documents sufficient to show the recipients of the funding, and copies of the slides, videos, handouts, promotional materials, and any other related materials produced.

8)   Documents sufficient to show funding Depomed has provided to the following entities since January 2012, including the date of specific payments, the amount of each payment, the purpose of each payment (CME funding, research funding, etc.), if specified, year-end or year-to-date payment totals per year, and the cumulative total payments to each organization:

      a.   American Academy of Pain Medicine
      b.   American Pain Society
      c.   American Pain Foundation
      d.   American Geriatrics Society
      e.   American Chronic Pain Association
      f.   American Society of Pain Educators
      g.   The National Pain Foundation
      h.   Pain & Policy Studies Group
      i.   Federation of State Medical Boards
      j.   American Society of Pain Management Nursing
      k.   Academy of Integrative Pain Management
      l.   U.S. Pain Foundation
      m.   Cancer Action Network
      n.   Washington Legal Foundation
      o.   The Center for Practical Bioethics
      p.   The Joint Commission
      q.   Pain Care Forum
      r.   Any other organization receiving funding from Depomed for the purpose of developing guidelines on pain management or opioid use

9) Any reports Depomed has issued to government agencies since January 2012 in accordance with corporate integrity agreements or other settlement agreements.

10) Any document productions Depomed has made since January 2012 to the Department of Justice, the Department of Health and Human Services Office of Inspector General, state attorneys general, any committee or subcommittee of the U.S. Congress, and any U.S. Attorney's office related to the issues outlined in the requests above or Depomed's opioid products generally.

93. News of Senator McCaskill's investigation caused the Company's stock price to drop precipitously over the next few days. By March 31, 2017, it had dropped nearly 16%, representing a decline of almost $146 million in market capitalization.

94. Defendants Saks and Zenoff resigned from the Board the same day Senator McCaskill's investigation became public. The Company announced the resignations in a March 28, 2017 press release and Form 8-K that made no mention of Senator McCaskill's investigation.

95. It was not until August 7, 2017, that the Individual Defendants finally publicly acknowledged the Senator McCaskill investigation. The Company filed its quarterly report for the second quarter of 2017 with the SEC on Form 10-Q, which was signed and certified pursuant to SOX by defendants Higgins and Moretti. It revealed not only McCaskill's Senate investigation, but previously undisclosed investigations by the Maryland Attorney General and the U.S. Department of Justice. All three investigations focusing on the Company's opioid sales and marketing practices, were disclosed as follows:

*Opioid-Related Request and Subpoenas*

The Company and a number of other pharmaceutical companies recently received a request for information from the ranking minority member of the United States Senate Committee on Homeland Security and Governmental Affairs related to the promotion of opioids. The Company has voluntarily furnished information responsive to such request.

The Company and a number of other pharmaceutical companies recently received subpoenas related to opioid sales and marketing from the Office of the Attorney

General of Maryland and the United States Department of Justice. The Company is currently cooperating with the State of Maryland and the Department of Justice in their respective investigations.

96.     The same quarterly report also featured lowered financial guidance due to the investigations.  2017 full-year guidance was lowered from $405-425 million to $395-410 million due to "increased pressure on short-acting and long-acting opioid markets by federal and state governments, managed care and other stakeholders," as well as "legal expenses associated with responding to recent government inquiries and subpoenas directed to opioid manufacturers."  The Company also lowered its adjusted EBITDA from $120-130 million to $107-117 million.

97.     News of the investigations and lowered guidance caused another stock drop.  This time the Company's stock price fell over 33%, representing an additional decline of over $194 million in market capitalization.

98.     The investigations of opioid manufacturers and distributors have only continued to ramp up.  Subsequently, Depomed was also informed of investigations by the New Jersey and Missouri Attorneys General.  On September 20, 2017, 41 states' attorneys general announced subpoenas focused on how the major opioid companies marketed and sold prescription opioids.

99.     In February 2018, Senator McCaskill released a report detailing some findings from her investigation.  Paramount among these findings were contributions by Purdue Pharma, Johnson & Johnson's Janssen, Depomed, Insys Therapeutics, and Mylan to 14 patient organizations and affiliated individuals between 2012 and 2017.  With the backing of these large pharmaceutical companies, the groups "amplified messages favorable to increased opioid use," according to the report.

100.    Depomed contributed over $1 million during the period.

101.    As noted by Senator McCaskill:

The pharmaceutical industry spent a generation downplaying the risks of opioid addiction and trying to expand their customer base for these incredibly dangerous medications, and this report makes clear they made investments in third-party organizations that could further those goals.  These financial relationships were insidious, lacked transparency and are one of many factors that have resulted in arguably the most deadly drug epidemic in American history.

102.    As noted by Lewis Nelson, a Rutgers University doctor and opioid expert, according to the Center for Public Integrity:

It looks pretty damning when these groups were pushing the message about how wonderful opioids are and they were being heavily funded, in the millions of dollars, by the manufacturers of those drugs.

## CONFIDENTIAL BOARD MATERIALS

103.    On November 17, 2017, Plaintiff made a demand pursuant to California Corporations Code § 1601 on the Depomed Board to produce documents related to the government investigations and the Company's off-label marketing practices.

104.    After negotiation regarding the validity and scope of the Books and Records Demand, Depomed agreed to turn documents over to Plaintiff pending the execution of a confidentiality agreement.

105.    On January 9, 2018, the parties executed a confidentiality agreement, and, on January 22, 2018, Plaintiff received the first production of documents from Depomed.

106.    The Confidential Board Materials ████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████

107.    ████████████████████████████████████████████████
████████████████████████████████████████████████████████

108. ████████████████████████████████████████

109. ████████████████████████████████████████

110. ████████████████████████████████████████

111. ████████████████████████████████████████████

112. ████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████

113.    ██████████████████████████ the Company filed its quarterly report for the second quarter of 2016, espousing the importance of "comply[ing] with applicable legal and regulatory requirements" in the marketing and promotion of Lazanda and NUCYNTA and emphasizing the risks associated with, and "significant liability" that may be incurred from, a "determin[ation] that we are promoting or have in the past promoted the 'off-label' use of drugs,"

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████

114.    ██████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ Indeed, ██████

██████████████████ the Board members knew, and had even acknowledged in public filings, that serious potential harm would result from failure to comply with the "substantial" regulations over

pharmaceutical marketing and promotion, including, as set forth by the Individual Defendants in the quarterly report for the second quarter of 2016:  (i) "significant liability;" (ii) "civil and administrative remedies; (iii) criminal sanctions;" (iv) diversion of "management's attention from our business operations;" (v) damage to "our reputation;" (vi) "seizure of products;" (vii) "injunctions;" and (viii) "exclusion of our products from reimbursement under government programs."

115. ██████████████████████████████████████████████████████████

████████ the Company's third quarter 2016 quarterly report, which would also emphasize the "substantial" regulations effecting pharmaceuticals, the necessity of "comply[ing] with applicable legal and regulatory requirements" in the promotion of Lazanda and NUCYNTA and the heightened risk of "significant liability if it is determined that we are promoting or have in the past promoted the 'off-label' use of drugs." ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████

116. ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

117.

118.

119.



120.

Instead, they abdicated their fiduciary duties in favor of generating massive profits by illegally marketing and promoting dangerous opioid medications and misleading the investing public as to their oversight (or lack thereof) of the same.

121.

On August 15, 2018, the Board adopted a charter for the newly formed Assertio Therapeutics, Inc. Opioid Matter Oversight Committee. The purpose of the committee, as stated in the charter is as follows:

> The Opioid Matter Oversight Committee (the "Committee") will provide assistance to the Board of Directors (the "Board") and its committees, as applicable, with oversight as to risk exposures and management's risk monitoring, compliance programs and other mitigation activities in connection with (i) the historical commercialization of opioid drugs by Depomed, Inc. (the "Company") and (ii) governmental investigations, litigation or other proceedings that may relate thereto (collectively, "Opioid Matters"). The Committee will have free and open communication with the directors and the executive management of the Company.

122.   Unfortunately for Depomed, the damage has already been done.

**DAMAGES TO DEPOMED**

123.     The Individual Defendants caused the Company to engage in a multi-year illegal scheme to market off-label uses for its dangerous opioid drugs and to disseminate false and misleading statements and omit material information to make such statements not false and misleading when made about the same.  The government investigations and improper statements have devastated Depomed's credibility.  Depomed has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

124.     Indeed, the Individual Defendants' false and misleading statements as alleged herein, have subjected Depomed to the Securities Class Action.

125.     In addition, Depomed has suffered monetary damages in the form of the costs associated with the investigations by the U.S. Senate, Maryland, Missouri, and New Jersey Attorneys General, and U.S. Department of Justice, as well as the Securities Class Action. Depomed may also lose its ability to sell lucrative opioid medications as the result of punishment stemming from these investigations.

126.     As a direct and proximate result of the Individual Defendants' actions as alleged herein, Depomed's market capitalization has been substantially damaged, and reduced by over $1.6 billion.

127.     Moreover, these actions have irreparably damaged Depomed's corporate image and goodwill.  For at least the foreseeable future, Depomed will suffer from what is known as the "liar's discount," a term applied to the stocks of companies that have been implicated in illegal behavior and have misled the investing public, such that Depomed's ability to raise equity capital or debt on favorable terms in the future is now impaired.

128.     In an attempt to mitigate this "liar's discount," Depomed rebranded as Assertio Therapeutics, Inc. on August 14, 2018.  It also reincorporated in Delaware and moved its

headquarters to Lake Forest, Illinois.  The costs associated with these changes are also attributable to the wrongdoing described herein.

## PLAINTIFF'S DEMAND AND DERIVATIVE ALLEGATIONS

129.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

130.    Plaintiff brings this action derivatively in the right and for the benefit of the company to redress the Individual Defendants' breaches of fiduciary duties.

131.    Plaintiff is an owner of Depomed common stock and was an owner of Depomed common stock at all times relevant hereto.

132.    Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

133.    As a result of the facts set forth herein, Plaintiff has not made any demand on the Depomed Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

134.    At the time this action was commenced, the Board consisted of seven directors: defendants Higgins, Staple, Fogarty, Dawes, Lavigne, Tyree, and McKee (the "Director Defendants").  The Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.  Because these defendants represent a majority of the Board, any demand on the Board would be futile.

**Demand is Futile as to Higgins, Staple, Fogarty, Dawes, Lavigne, Tyree, and McKee Because They Face a Substantial Likelihood of Liability**

135.    Defendants Higgins, Staple, Fogarty, Dawes, Lavigne, Tyree, and McKee face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were

directors at the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate. In addition, defendants Higgins, Staple, Fogarty, Dawes, Lavigne, Tyree, and McKee had a fiduciary duty to ensure that the Company was operated in a lawful manner.

136.     Moreover, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, they knowingly and/or with reckless disregard reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above and allowed the Company to be operated in an illegal manner.

137.     The Director Defendants' making or authorization of false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of fiduciary duties, for which the Director Defendants face a substantial likelihood of liability. If the Director Defendants were to bring suit on behalf of Depomed to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason, demand is futile.

138.　███████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████ ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████

**Lavigne, Staple, Tyree, Dawes, and McKee Face a Substantial Likelihood of Liability as Members of the Audit Committee**

139.　Defendants Lavigne, Staple, Tyree, Dawes, and McKee, as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the filing of false and misleading statements.　More specifically, as members of the Audit Committee, Lavigne, Staple, Tyree, Dawes, and McKee were obligated to review the Company's annual and quarterly reports to ensure their accuracy.　████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████ For this reason, demand is futile as to Lavigne, Staple, Tyree, Dawes, and McKee.

140.　In addition, ████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████ They failed to carry out this duty, and for this reason also, demand is futile as to Lavigne, Staple, Tyree, Dawes, and McKee.

**Higgins Lacks Independence**

141.    As an initial matter, Depomed has conceded in its SEC filings that Higgins is not an independent director of the Company.  The 2018 proxy statement states the Higgins is not independent under the applicable SEC rules and regulations and the Nasdaq Global Market listing requirements and rules.

142.    In addition to this lack of independence, Higgins is not disinterested for purposes of demand futility because his principal occupation is President and CEO of Depomed.  According to the Company's SEC filings, in 2017, Higgins received total compensation of $4,766,537.  This amount is material to him.

143.    Higgins is incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Action.

**Higgins, Staple, Fogarty, Dawes, Lavigne, Tyree, and McKee Are Not Disinterested**

144.    If Depomed's current officers and directors are protected against personal liability for their breaches of fiduciary duties alleged in this Complaint by Directors & Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders.  However, Plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by Depomed against the Individual Defendants, known as the "insured versus insured exclusion."

145.    As a result, if the Director Defendants were to sue themselves or certain of the officers of Depomed, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively,

as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  Therefore, the Director Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

146.    Under the factual circumstances described herein, the Director Defendants are more interested in protecting themselves than they are in protecting Depomed by prosecuting this action. Therefore, demand on Depomed and its Board is futile and is excused.  Depomed has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing. Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct.  Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

## COUNT I

### Breach of Fiduciary Duty
### (Against the Individual Defendants)

147.    Plaintiff incorporates by reference all preceding and subsequent paragraphs, as if fully set forth herein.

148.    The Individual Defendants owed and owe Depomed fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Depomed the highest obligations of loyalty, good faith, due care, oversight, fair dealing, and candor.

149.    All of the Individual Defendants violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, fair dealing, and candor.

150.    Each of the Individual Defendants had actual or constructive knowledge that the Company was illegally marketing its dangerous opioid medications for off-label uses.  These

actions caused severe risks to the Company and were actually causing harm to the Company by subjecting the Company to several government investigations and the Securities Class Action.  The Individual Defendants' actions (and inactions) could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

151.    The Individual Defendants caused or allowed Depomed to lack requisite internal controls, and, as a result, the Company regularly made false and misleading statements regarding the Company's opioid marketing practices and regulatory scrutiny related thereto.

152.    The Individual Defendants failed to supervise or exert internal controls over the Company, and consciously disregarded their responsibilities to Depomed.

153.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Depomed has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.  The Individual Defendants breached their fiduciary duties owed to Depomed and its stockholders by willfully, recklessly, and/or intentionally failing to perform their fiduciary duties.  They caused the Company to waste valuable assets and unnecessarily expend corporate funds.  They also failed to properly oversee Depomed's business, rendering them personally liable to the Company.

## COUNT II

### Violations of Section 14(a) and SEC Rule 14a-9
### (Against the Individual Defendants)

154.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

155.    SEC Rule 14a-9, promulgated pursuant to Section 14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any

material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

156.    The 2016 Proxy and 2017 Proxy (collectively, the "Proxies") violated Section 14(a) and Rule 14a-9 because they solicited Depomed stockholder votes for, *inter alia*, director reelection, share issuances, approval of executive compensation, and ratification of the Company's independent registered public accounting firm, while simultaneously misrepresenting and/or failing to disclose the Company's illegal off-label marketing of dangerous opioid medications and the government investigations related thereto.

157.    As alleged herein, in the Proxies, the Individual Defendants specifically referenced the Code, which includes special ethical obligations regarding financial reporting such that all SEC filings are to be accurate.  Because the Company, under the Individual Defendants' direction and on their watch, was issuing false and misleading statements, the Individual Defendants affirmatively violated the Code.  The Proxies failed to disclose that express terms of the Code were being violated.

158.    The Individual Defendants caused the Company to make untrue statements of material facts and omit material facts necessary to make the issued statements not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9.  By virtue of their positions within the Company and/or roles in the process and in the preparation of the Proxies, the Individual Defendants were aware of this information and of their duty to disclose this information in the Proxies.

159.    The Individual Defendants knew that the statements contained in the Proxies were materially false and misleading.

160.    The omissions and false and misleading statements in the Proxies are material in that a reasonable stockholder would consider them important in deciding how to vote on the re-election of directors and the ratification of the Company's auditor.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxies and in other information reasonably available to stockholders.

161.    As a direct and proximate result of the dissemination of the false and/or misleading Proxies the Individual Defendants used to obtain stockholder approval of and thereby re-elect directors, nominal defendant Depomed suffered damage and actual economic losses (*i.e.*, wrongful re-election of directors) in an amount to be determined at trial

## COUNT III

### Unjust Enrichment
### (Against the Individual Defendants)

162.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

163.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Depomed.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Depomed.

164.    Plaintiff, as a stockholder and representative of Depomed, seeks restitution from the Individual Defendants and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and fiduciary breaches.

## COUNT IV

**Waste of Corporate Assets**
**(Against the Individual Defendants)**

165.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

166.    As a result of the Individual Defendants' failure to implement adequate internal controls to ensure that the Company's SEC filings were accurate, Depomed is subject to the Securities Class Action.  Further, the Company is now the subject of ongoing investigations led by the U.S. Senate Committee on Homeland Security and Governmental Affairs, the Maryland, Missouri, and New Jersey Attorneys General, and the U.S. Department of Justice.  The Individual Defendants have caused Depomed to waste its assets by forcing it to defend itself in the ongoing litigation and cooperate in the ongoing investigations, in addition to any ensuing costs from a potential settlement, adverse judgment, or criminal penalties.  The Company also had to pay the costs associated with rebranding as Assertio Therapeutics, Inc., reincorporating in Delaware, and moving its headquarters to Illinois.

167.    In addition, by failing to conduct proper supervision, the Individual Defendants have caused Depomed to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors who breached their fiduciary duties.

168.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of Depomed and that Plaintiff is an adequate representative of the Company;

B.      Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, unjust enrichment, waste of corporate assets, and violations of the federal securities laws;

C.      Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties and other violations of law;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, and costs and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  December 21, 2018

**RIGRODSKY & LONG, P.A.**

By:  */s/ Brian D. Long*

**OF COUNSEL:**

**BRAGAR EAGEL & SQUIRE, P.C.**
Todd H. Henderson
Melissa A. Fortunato
885 Third Avenue, Suite 3040
New York, NY 10022
212-308-5858

**HYNES KELLER & HERNANDEZ, LLC**
Beth A. Keller
118 North Bedford Road
Suite 100
Mount Kisco, NY 10549
914-752-3040

Michael J. Hynes
Ligaya T. Hernandez
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
484-875-3116

Brian D. Long (#4347)
Gina M. Serra (#5387)
300 Delaware Avenue, Suite 1220
Wilmington, DE 19801
Telephone: (302) 295-5310
Facsimile: (302) 654-7530
Email: bdl@rl-legal.com
Email: gms@rl-legal.com

*Attorneys for Plaintiff*